BNC/KDS
F. #2019R00004

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - against -

ROCCO MANZIONE,

           Defendant.

- - - - - - - - - - - - - - - - X

**GOVERNMENT'S AMENDED MEMORANDUM IN AID OF SENTENCING**

1:20-cr-00461-RPK

The United States of America, by and through undersigned counsel, respectfully submits this memorandum in aid of the sentencing of the defendant, Rocco Manzione, currently scheduled for April 26, 2022. Defendant Manzione funded a lavish lifestyle by pocketing for himself over $1 million withheld from his employees' paychecks that was supposed to pay federal income and payroll taxes. Moreover, he concealed millions of dollars of his personal income, first by conspiring with his accountant and later by using a shell entity and nominee bank accounts. In total, he caused a tax loss of approximately $2,828,873 to the United States government. The defendant's conduct was egregious, and the Government respectfully requests that the Court sentence him to a within-Guidelines sentence of 30 to 37 months in prison, followed by 24 months' supervised release. Such a sentence would be "sufficient, but not greater than necessary, to comply with" the goals of 18 U.S.C. § 3553.

## PROCEDURAL BACKGROUND

On October 16, 2020, the Grand Jury returned an indictment charging defendant Manzione with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371; three counts of filing false tax returns, in violation of 26 U.S.C. § 7206(1), two count of tax evasion, in violation of 26 U.S.C. § 7201; 34 counts of failure to pay over trust fund taxes to the Internal Revenue Service ("IRS"), in violation of 26 U.S.C. § 7202; and one count of failure to file an individual income tax return, in violation of 26 U.S.C. § 7203. Pursuant to a plea agreement, on September 23, 2021, Defendant Manzione pleaded guilty to one count of tax evasion, in violation of 26 U.S.C. § 7201 (Count 13), and one count employment tax fraud, in violation of 26 U.S.C. § 7202 (Count 22).

## FACTUAL SUMMARY

Since approximately 2001, defendant Manzione has owned and operated a series of concrete businesses (the "Concrete Companies"), all of which maintained physical locations in Brooklyn, New York. (PSR ¶ 5). These companies included Advanced Ready Mix Supply Corp. ("Advanced Ready"), which Manzione owned and operated from approximately March 2011 through June 2012; Advanced Transit Mix Corp. ("Advanced Transit"), which Manzione owned and operated from July 2012 through December 2016; Advanced Concrete Leasing Corp. ("Advanced Concrete"), which Manzione owned and operated from March 2014 through March 2017; and All American Transit Mix Corp. ("All American"), which Manzione, along

with his daughter, Catherine Manzione, owned and operated from June 2013 through September 2017. (*Id.*). Although Manzione changed the names of the companies over time, their business operations remained substantially the same. (PSR ¶ 9).

From at least 2011 through 2017, Manzione withheld more than $1 million in federal income tax, as well as Social Security, and Medicare taxes (the "employment taxes") from his employees' wages, and, instead of paying any of it over to the IRS, he kept it. (PSR ¶ 7). Manzione also failed to timely file Forms 941, U.S. Employer's Quarterly Federal Tax Returns, and failed to pay the Concrete Companies' matching share of the employment taxes. (*Id.*). Rather than paying taxes, Manzione funded family vacations, multiple mortgages, private school tuition, luxury vehicles, and a large brokerage account. Even when he finally decided to file some of the delinquent Forms 941 in or around June 2017, Manzione did not bother to pay the taxes owed. His extravagant personal spending, on the other hand, continued uninterrupted. (*See, e.g.*, PSR ¶ 15).

Manzione argues in his Sentencing Memorandum that correspondence reflects that he "repeatedly pressed" his accountant, John Savignano, to prepare his delinquent payroll tax forms and negotiate a payment plan. (Doc. 38 at 2). This is simply not so. For example, in an email exchange dated January 24, 2017, provided to the government by Catherine Manzione's counsel, the focus was on unpaid corporate taxes. (Exhibit A). In this email exchange, Karen Jou, a CPA from Savignano's accounting firm, explained to Catherine Manzione that there was

3

corporate tax balance, and that she had been informed by IRS that other taxes were outstanding. Jou asked Catherine:

> As I have only sent in authorization[1] for the corporate taxes, they aren't able to tell me what else you owe for other taxes. Have you received any notices for payroll or other types of taxes?

Clearly, in 2017, Savignano's firm had only been dealing with the unpaid corporate taxes- not employment taxes. Manzione then chimed in:

> Hi Karen with the Power of Attorney they won't tell you what's outstanding if it's the payroll taxes that's going to be an exuberant amount of money in the meantime with corporation [expletive] down we can't even get a business loan or open any bank accounts so it seems we are handcuffed at this point and that is not a good position to be in….

(*Id*.). Manzione acknowledged himself that he had greater knowledge of those liabilities than the firm did. In any event, Manzione's argument also ignores that the employment tax debt is the result of his decision to spend the taxes withheld from employee paychecks on himself, rather than paying them over to the IRS as he was supposed to do. It is not as though Manzione was a struggling businessman who only later found the means to pay off his tax debts.

In his Sentencing Memorandum, Manzione also appears to claim that he asked his accountants about filing and paying his employment taxes so frequently, they remarked that they [Manzione and his daughters] "are driving me crazy." (Doc. 38 at 2). This again mischaracterizes the nature of Manzione's efforts (or lack thereof) to pay his taxes. The email dated January 24, 2017, attached as Exhibit B, relates to an employee at Advanced Transit Mix requesting an email listing "all the

---

[1] This refers to a power-of-attorney authorization, through which a taxpayer authorizes an accountant, return preparer, or attorney to communicate with the IRS on the taxpayer's behalf.

4

taxes that were filed for All American Transit Mix and what payments were made." As noted above, All American Transit never filed Forms 941—delinquent or otherwise—and made minimal payments.

In sum, the correspondence does not reflect Manzione's desire to become compliant with his taxes, particularly his employment taxes. When he finally filed delinquent employment tax returns, he did not make a single payment towards those liabilities.

Manzione's tax fraud was not limited to pocketing more than $1 million in employment taxes. From at least 2012 through 2017, he took various steps to conceal his true income and evade his tax liabilities. First, he conspired with his accountant to file false individual income tax returns for the years 2012 through 2014. (PSR ¶ 11-13). Second, he did not file federal individual tax returns at all for the years 2015 through 2017. (PSR ¶ 14-16). Third, he took affirmative steps to conceal more than $1 million of income during 2016 and 2017 by using a nominee entity and nominee bank accounts. (PSR ¶ 15).

In or around late 2015, Manzione wanted to apply for a mortgage to purchase a condominium in Miami, Florida, but lenders required copies of three years of federal income tax returns. (PSR ¶ 11). Having not filed any corporate or individual tax returns for 2012 through 2014, Manzione had a dilemma. He needed to show sufficient income to qualify for a mortgage, but he did not want to report and pay taxes on his actual income. His solution was to conspire with John Savignano, his accountant, to file false tax returns reporting fictitious income from

5

one of Manzione's defunct entities, Troutman Corp. (PSR ¶ 13). Savignano and Manzione reported W-2 wages from Troutman for the 2012 through 2014 tax years in the amount of $100,000, $250,000 and $250,000, respectively. (*Id*.). These amounts bore no relationship to Manzione's actual income and, for 2014, failed to take into account the sale of one of Manzione's properties which realized more than $1.8 million in capital gains earnings. (PSR ¶ 12). Savignano even prepared Forms 941 for Troutman that reported the fictious wages claimed by Manzione on his tax returns. (PSR ¶ 13). Even after making the effort to fraudulently minimize the income he reported, Manzione *still* did not pay even these artificially deflated tax liabilities.

In 2015, Manzione earned more than $100,000 in income, but he neither filed a tax return nor made any payments. (PSR ¶ 14). Similarly, for 2016 and 2017, despite earning more than $1.6 million collectively, Manzione did not file federal tax returns. Instead, he transferred $1.6 million from the Concrete Companies into an account held in the name of a nominee, RA Equities. He then used the funds in that account to pay the mortgage and expenses for his Miami condominium and to fund a brokerage account he also held in the name of RA Equities. In 2017, Manzione transferred more than $1 million to the brokerage account.

Interestingly, Manzione claims that he did not attempt to conceal his income from when he transferred nearly $2 million from the Concrete Companies to an account held in the name of a nominee company, RA Equities. (Doc. No. 38 at 2-3). This claim appears to be based on the fact that he was a member of the LLC and

6

one of the signatories on the RA Equities account. (*Id*.). But this argument defies logic. As Manzione admits in his memorandum, "he failed to file a personal return for that year as well as others." Manzione not only failed to file a personal return, but he also failed to file corporate returns for the companies. So, the income he earned through the Concrete Companies was wholly unreported. If Manzione was not attempting to conceal the approximately $1.6 million in transfers from his concrete companies to himself for his personal use, then he could have simply transferred the money to his personal account–an account held in his own name. Instead, he created a separate entity and used it purchase and hold title to that property, using funds from the Concrete Companies. (PSR ¶ 71). He also opened bank accounts in the name of RA Equities, including a brokerage account, and transferred funds from the Concrete Companies into those accounts. (*Id*.).

Manzione implies that $1.2 million of the funds transferred to the RA Equities brokerage account were not personal in nature. (*See* Doc. 38 at 3 ("Rather than being used solely to pay personal expenses, as suggested by in [sic] the PSR, approximately $1.2 million of these funds were transferred to a brokerage account…"). Manzione's implication that these transactions were something other than personal in nature is illogical. They were transferred to his nominee account, and he could withdraw and spend those funds however he chose to do so. The fact that he may have treated the brokerage account as a savings account does not somehow change its nature into something other than "personal."

## TAX LOSS

As stated in Manzione's PSR, the total tax loss is as follows:

| Type of Tax | Amount | Citation |
|---|---|---|
| Employment Taxes | $1,733,373.22 | PSR ¶ 10 |
| Personal Taxes | $1,095,500.00 | PSR ¶ 16 |

The total tax loss is **$2,828,873.22**. (PSR ¶¶ 10, 16).

## ANALYSIS

I. **The Appropriate Guidelines Sentencing Range is 30 to 37 months.**

In formulating an appropriate sentence to address the defendant's violation of the law, the Court must first turn to the United States Sentencing Guidelines. The Guidelines "serve as the starting point for the district court's decision and anchor the court's discretion in selecting an appropriate sentence." *United States v. Molina-Martinez*, 136 S. Ct. 1338, 1349 (2016). Starting with the Guidelines' framework helps promote uniformity and fairness. In most instances, "the Guidelines are not only the starting point . . . but also the lodestar." *Molina-Martinez*, 136 S. Ct. at 1346.

In connection with Rocco Manzione's sentencing, as set forth in the parties' plea agreement, Rocco Manzione's offense level is 19, based on the following:

- A base offense level of 22, pursuant to U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1(H), because the offense involved a tax loss of $2,828,873.22. (PSR ¶19).

- 2-level downward adjustment for acceptance of responsibility for the offense should his acceptance of responsibility continue through the date of sentencing, pursuant to U.S.S.G. § 3E1.1(a). (PSR ¶24).

8

- An additional 1-level downward adjustment for assisting authorities in the prosecution of the defendant's own misconduct by timely notifying authorities of his intention to plead guilty, pursuant to U.S.S.G. § 3E1.1(b). (PSR ¶46).

Manzione's criminal convictions resulted in a criminal history score of zero. (PSR ¶50). Thus, if the Court accepts the government's calculation of the applicable guidelines, Manzione has a total offense level of 19, which would yield a final advisory Guidelines range of 30 to 37 months' imprisonment.

## II. A Guidelines Sentence is Warranted under 18 U.S.C. § 3553(a)

In addition to determining the Guidelines range, the Court must also weigh the sentencing factors set forth in 18 U.S.C. § 3553(a) to determine a defendant's sentence. Those factors include: (A) the nature and circumstances of the offense; (B) the history and characteristics of the defendant; (C) the need for the sentence imposed to reflect the seriousness of the offense; (D) the need for specific deterrence; and (E) the need for general deterrence.

In determining that sentence, this Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), the Guidelines and Guideline range, § 3553(a)(4), the Guidelines' policy statements, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

A sentencing court may not "presume that a sentence within the applicable Guidelines range is reasonable," but must consider the § 3553(a) factors. *Nelson v.*

9

*United States*, 555 U.S. 350, 352 (2009). Nonetheless the Guidelines and the post-*Booker* sentencing regime sensibly "steer district courts to more within-Guidelines sentences." *Peugh v. United States*, 569 U.S. 530, 531 (2013). That is because "[t]he post *Booker* federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark through the process of appellate review." *Id.* at 541.

Here, a sentence at the high end of the guidelines appropriately considers the nature and circumstances of the offense; reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; protects the public from further crimes by the defendant; affords adequate deterrence; is consistent with the Sentencing Commission's policy statements on the need for deterrence in tax crimes; and is no greater than necessary for these purposes. 18 U.S.C. § 3553(a)(1), (2), (5), (6). Specifically, this Court should impose the government's recommended sentence for the following reasons:

1. *Nature, Circumstances, and Seriousness of the Offenses*

Defendant Rocco Manzione 's crime is significant. The defendant took deliberate and willful steps to defraud the United States and to profit from that conduct. Manzione's criminal conduct spanned at least seven years, during which he failed to report approximately $3.3 million dollars in income and failed to pay over more than $1 million in employment taxes that he withheld from his employees' wages. Manzione's crimes were not mere acts of omission; rather, he took

10

affirmative steps to conceal his income and employment tax liabilities from the United States.

As described above, in around late 2015, the defendant knew that he had neither filed nor paid individual income taxes since 2011, and he knew that he already owed what he would later call an "exuberant amount" of employment taxes. Notwithstanding those obligations, Manzione wanted to purchase a $1 million-plus condominium in Miami. Manzione and his accountant, Savignano, concocted a scheme to qualify him for a mortgage without drawing too much attention to his past liabilities or lucrative business and investment activities. Even after fraudulently minimizing his income tax bill, he continued to short-change the United States Treasury, choosing instead to maintain his lifestyle.

Along those same lines, Manzione diverted a significant amount of business income to accounts held in the name of RA Equities. He then used those funds to pay for his condominium, various renovations, and fund a significant brokerage account. All the while, he was not filing tax returns, paying individual taxes, and, as described below, not paying over the employment taxes he had effectively stolen from his employees' wages.

Between 2011 and 2017, Manzione withheld more than $1 million dollars from his employees' wages but used the money on himself instead of paying it over to the IRS. Manzione attempts to minimize his conduct as "garden variety failure to pay employment taxes." (Doc. 38 at 2). This is patently untrue. Manzione has operated concrete companies since 2001 (PSR ¶ 5), and, in the years at issue in the

11

indictment alone, used four different business names. Throughout that time he actively avoided paying his employment taxes through dishonest means. His further attempts to blame others, namely his accountant, is belied by both correspondence and the fact that he failed to make a single employment tax payment over an extended period of time.

Manzione's tax fraud was egregious and the loss was substantial, resulting in a total tax loss of more than $2 million.

### 2. *Need to Promote Respect for the Law and Just Punishment*

The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system, which is dependent upon a system of voluntary compliance. The income tax laws of our country, in effect, reflect an honor system under which citizens are required to cooperate with the government and to file true and accurate returns. Therefore, it is vital that when a citizen is non-compliant, that citizen is appropriately punished. As the U.S. Sentencing Guidelines Manual § 2T1.1 introductory commentary aptly states, "Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws." *See United States v. Zukerman,* 897 F.3d 423, 427 (2d Cir. 2018) (explaining that "'tax crimes represent an especially damaging category of criminal offenses,' which 'strike at the foundation of functioning government'") (citations omitted).

Manzione's crimes stand in direct opposition to the legitimacy of the tax system in this country, particularly since he successfully defied the IRS for so many

12

years. Failure to sentence him to a term of incarceration would send the wrong message: "that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). And, although imposing a sentence which prioritizes restitution might be "desirable, so is the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail." *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (cited and quoted with approval in *United States v. Levinson*, 543 F.3d 190, 197 (3d Cir. 2008). [2] Accordingly, a term of incarceration is required to promote respect for the law and, as more fully described below, provide just punishment for Rocco Manzione's crimes.

---

[2] *See also United States v. Sample*, No. 17-2086, 2018 WL 4056013, at *2-3 (10th Cir. Aug. 27, 2018), (vacating probationary sentence for white-collar defendant who was sentenced to probation on the rationale that it would allow him to continue to work and repay his victims as impermissibly sentencing defendant based on his income); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) 1329 ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *United States v. Stall*, 581 F.3d 276, 286 (6th Cir. 2009) ("We do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose."); *United States v. Ture*, 450 F.3d 352, 359 (8th Cir. 2006) (deciding against a term of imprisonment based on the fact that defendant "owes a substantial amount of back taxes, interest, and penalties . . . is entirely improper and . . . results in bad public policy"); *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Business criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity."). *Cf.* 28 U.S.C. § 994(d)(11) (requiring that the Commission "shall assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders").

### 3. *Need to Afford Adequate Deterrence*

The Sentencing Guidelines clearly articulate that deterrence should be the primary consideration when sentencing defendants for tax crimes. The reasoning is compelling. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from disobeying the tax laws is of the utmost importance when punishing criminal tax violations. U.S.S.G. § 2T1, introductory cmt. (2016).

General deterrence is the essential means of minimizing the ever-increasing amount of money estimated to be lost each year through tax fraud. Our nation's system of tax laws relies on the voluntary compliance of individual taxpayers to accurately report their income. And in fact, the majority of taxpayers do fulfill their legal obligations as citizens by honestly reporting and paying their taxes. However, IRS studies reveal that a persistent subset of the population—approximately 16.4 percent, based on the latest estimate—do not.[3] The result is a yearly so-called "tax gap" of more than $441 billion in unreported and uncollected taxes.[4] Of that amount, approximately $314 billion results from individuals' noncompliance, $42 billion from corporate income tax noncompliance, and $81 billion from employment tax

---

[3] Tax Gap Estimates for Tax Years 2011–2013, Publication 1415 (Rev. 9-2019), *available at* https://www.irs.gov/pub/irs-pdf/p1415.pdf.
[4] *Id.*

14

noncompliance.[5] Because of this noncompliance, law-abiding taxpayers incur the effective equivalent of a $3,000 "surtax" to subsidize tax cheats.[6]

Hundreds of billions of dollars are lost annually because people like Rocco Manzione–who otherwise take full advantage of what this country offers–choose to shirk their responsibilities as American taxpayers. Widespread noncompliance with the Internal Revenue Code is an ongoing problem that merits every court's consideration when sentencing defendants for committing tax offenses. Meaningful sentences– that is, ones that through their terms speak loudly–must be given so that others are forewarned of the consequences.

Absent such deterrence, other successful Americans with the means and opportunity to enrich themselves at the cost of their fellow taxpayers will cynically conclude that the potential rewards of such criminal activity outweigh the risks of being caught and punished for committing tax fraud. *See United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006) ("The goal of deterrence rings hollow if a prison sentence is not imposed."). The sentence imposed in this case should send a strong message to other would-be tax cheats that imprisonment is a reality for those who willfully violate the internal revenue laws. The sentence should also assure law-abiding taxpayers that they are not foolish for filing tax returns and paying their share of taxes. In short, our nation's tax system depends of the voluntary

---

[5] The other $4 billion results from estate and excise tax noncompliance. *Id.*
[6] National Taxpayer Advocate 2020 Purple Book: Compilation of Legislative Recommendations to Strengthen Taxpayer Rights and Improve Tax Administration, Publication 5286 (Rev. 12-2019), *available at* https://taxpayeradvocate.irs.gov/Media/Default/Documents/2019-ARC/ARC19_PurpleBook.pdf.

compliance of honest taxpayers. Here, a sentence of imprisonment promotes voluntary compliance by making clear that there are consequences for hiding income from the government and will certainly deter others by sending a message that cheating on your taxes bears very serious consequences.

Similarly, Manzione's conduct requires significant specific deterrence. Manzione has given no indication that he ever intended to comply with his tax obligations. Manzione's fraud was ongoing and persistent. As he admits, he had been the subject of a civil inquiry in as early as 2011. (Doc. 38 at 2). He further referenced the "voluminous correspondence" he received from the IRS. (*Id.*). Yet, none of that motivated Manzione to actually file and pay his taxes. Even when he finally filed delinquent Forms 941 in 2017, Manzione did not pay any of the liabilities. Further, one of his companies–All American–never filed Forms 941 at all. According to IRS records, it appears that Manzione made only minimal payments ($516 in 2013) from 2012 to 2017. Nothing about this prosecution has influenced Manzione's conduct.

Accordingly, the Government simply cannot ensure compliance with the Internal Revenue Code if the general public believes there are no meaningful repercussions for failing to comply with the tax laws. Sentencing the defendant to a substantial term of incarceration will convey the message to him and others that repeated efforts to cheat on one's taxes will be met with harsh punishment.

### 4. *Need to Avoid Unwarranted Sentencing Disparities Among Defendants Guilty of Similar Conduct*

The Sentencing Guidelines reflect the consensus that those convicted of economic crimes should not be able to avoid incarceration, even where such crimes constitute a defendant's first offense. The legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify the serious problem in the criminal justice system that white-collar offenders were not being adequately punished. See S. Rep. No. 98-225, at 77 (1983) ("[S]ome major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses."). As then Judge Breyer, previously an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white collar fraud was involved, courts granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

*See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 20-21 (1988).

The Guideline range reflects the seriousness of the offense, promotes respect for law, and provides for just punishment in this case. Anchoring the sentence to the Guideline range also serves the vital goal of uniformity and fairness in sentencing.

17

To be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Nevertheless, it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id.* at 108-09 (internal quotation marks omitted). Thus, "in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* at 109 (internal quotation marks omitted).

Furthermore, the Guidelines are often the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in creating the Sentencing Commission in the first place. Reference to the Guidelines, while carefully considering the Section 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing sentencing determinations from varying based on the luck of the judicial draw.

### RESTITUTION AND SUPERVISED RELEASE

Finally, pursuant to the plea agreement, the Parties have jointly requested that the defendant be ordered to pay restitution to the Internal Revenue Service. The government asserts that Manzione should pay restitution in the amount of $2,828,873.22 for the total loss caused by the defendant's conduct from 2011

18

through 2017. In addition, the Government requests that the Court impose a 24-month term of supervised release.

## CONCLUSION

The United States relies upon the honesty of taxpayers to fund its functions. The defendant made a deliberate choice to take advantage of the federal tax system for personal profit at the expense of the United States and of other honest taxpayers. For the foregoing reasons, the Government respectfully submits that a sentence of 30 to 37 months is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553.

Respectfully submitted,

BREON PEARCE
United States Attorney
Eastern District of New York

DAVID A. HUBBERT
Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

By: /s/
Brittney Campbell, Trial Attorney
Kathryn Carpenter, Trial Attorney
Tax Division
U.S. Department of Justice